UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :
                                                    :
                         -v-                        :
                                                    :
ARISTIDES RAMIREZ,                                  :
                                                    :
                         Defendant.                 :
                                                    :
---------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/8/2025

1:22-cr-522-3-GHW

<u>MEMORANDUM OPINION &
ORDER</u>

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Between 2019 and 2024, Defendant Aristides Ramirez, alongside his "crew" (the "174th Street Crew" or the "Crew"), allegedly operated a "24/7," open-air drug market in Washington Heights in Manhattan.  Mr. Ramirez and the Crew allegedly sold significant quantities of drugs including methamphetamine, cocaine, heroin, crack cocaine, fentanyl, oxycodone, Xanax, and marijuana.  The Government alleges that Mr. Ramirez was one of the Crew's senior leaders and decisionmakers who was responsible for overseeing all aspects of the Crew's drug dealing operations.

On November 1, 2024—one business day before trial was scheduled to begin—Mr. Ramirez pleaded guilty to conspiring to distribute narcotics and to using, carrying, and to possessing a firearm in furtherance of the drug trafficking conspiracy.  It was apparent to everyone present in the courtroom that day that Mr. Ramirez was overcome by emotion as the plea hearing began.  During the plea hearing, Mr. Ramirez accepted responsibility for his crimes—indeed, he implored the Court to accept his plea.  But Mr. Ramirez had a change of heart.  Over four months later, Mr. Ramirez moved to withdraw that guilty plea, arguing, principally, that his plea was not voluntary because he was coerced and confused and because of his counsels' ineffective assistance.  Because Mr.

Ramirez's guilty plea was voluntary, Mr. Ramirez's motion to withdraw his guilty plea is DENIED.

## II.    PROCEDURAL HISTORY

### A.    Pretrial Proceedings

On January 25, 2023, Mr. Ramirez, along with twenty-two other co-defendants, was charged in a two-count indictment with participation in a conspiracy to distribute illegal narcotics and possession of a firearm in furtherance of the alleged drug trafficking conspiracy.  Dkt. No. 22 (S1 1:22-cr-522, Superseding Indictment).  Mr. Ramirez was arrested the same day.  Dkt. No. 25.  At his initial presentment, Mr. Ramirez was appointed counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.  Dkt. No. 43.  Mr. Ramirez subsequently retained private counsel, Patrick J. Brackley, who appeared on February 2, 2023.  Dkt. No. 76.  As the case inched closer to trial, Mr. Ramirez's co-defendants began accepting plea deals and pleading guilty—the first of Mr. Ramirez's co-defendants to accept such a deal did so on March 30, 2024.  Dkt. No. 307.  On April 17, 2024, another of Mr. Ramirez's co-defendants pleaded guilty.

On May 5, 2024, the Court set deadlines for pretrial materials and scheduled trial for all of the remaining defendants, including Mr. Ramirez.  Dkt. No. 346.  The Court bifurcated the case into "groups" to accommodate the large number of co-defendants in this case.  *Id.* at 1.  For the "Group 1 Defendants," which included Mr. Ramirez, the Court set deadlines for filing any pretrial motions; expert disclosures; all pretrial materials, including any motions *in limine*; and scheduled the final pretrial conference.  Trial for the Group 1 Defendants would begin on November 4, 2024.  *Id.* Between May 22, 2024 and June 26, 2024, six more of Mr. Ramirez's co-defendants pleaded guilty. Pursuant to the May 5, 2024 scheduling order, two of Mr. Ramirez's co-defendants filed motions to suppress evidence in advance of trial.  Dkt. No. 387; Dkt. No. 392.

As the case progressed, the Government filed a sixth superseding indictment.  Dkt. No. 393 (S6 1:22-cr-522 Superseding Indictment or the "Superseding Indictment").  The Superseding

Indictment charged that Mr. Ramirez participated in a long-running conspiracy to distribute illegal narcotics in violation of 21 U.S.C. § 846. *Id.* ¶¶ 1–3. The Superseding Indictment also charged that Mr. Ramirez possessed a firearm in furtherance of the conspiracy, and that he brandished and discharged a firearm in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), and (c)(2). *Id.* ¶ 6. The day after the Government filed the Superseding Indictment, another of Mr. Ramirez's co-defendants pleaded guilty. Three other co-defendants pleaded guilty on July 26, 2024, on July 30, 2024, and on July 31, 2024.

On August 28, 2024, the Court extended the deadlines for the submission of pretrial materials. Dkt. No. 458. Between August 29, 2024 and September 18, 2024, before any pretrial motions were due, four more of Mr. Ramirez's co-defendants pleaded guilty. *See* Dkt. No. 462. The Government filed its motions *in limine* and requests to charge on September 25, 2024. Dkt. No. 508; Dkt. No. 510; Dkt. No. 511. And Alvin Eusebio, one of the remaining Group 1 Defendants, filed a motion *in limine*, Dkt. No. 512, proposed voir dire questions, Dkt. No. 514, requests to charge, Dkt. No. 515, and a request to receive non-prison clothes for trial, Dkt. No. 551. Mr. Ramirez's counsel did not file any proposed voir dire questions or requests to charge.

The final pretrial conference was held on October 25, 2024 during which the Court delivered its decision on the pending motions *in limine* orally. At the time of the final pretrial conference, only three Group 1 Defendants remained who were proceeding to trial—Alexander Francisco, Alvin Eusebio, and Mr. Ramirez himself. Mr. Ramirez retained additional counsel, Darren S. Fields, who appeared on behalf of Mr. Ramirez on October 29, 2024. Dkt. No. 569. That same day, Mr. Fields requested that Mr. Ramirez be permitted to wear civilian clothes during trial and that Mr. Ramirez be permitted to receive such clothing prior to trial. Dkt. No. 570. The Court granted that request the following day. Dkt. No. 571.

On October 31, 2024, the Court directed the three remaining Group 1 Defendants to

provide any final comments on the drafts of the voir dire questions that it had provided to the parties.  Dkt. No. 576.  Also on October 31, 2024, another of Mr. Ramirez's co-defendants pleaded guilty.  As of November 1, 2025, three Group 1 Defendants remained in the case for trial:  Mr. Eusebio, Mr. Francisco, and Mr. Ramirez.

###### B.      The November 1, 2024 Change of Plea Hearing

On October 31, 2025, at Mr. Ramirez's request, the Court scheduled a change of plea hearing for the following day.  Dkt. No. 579.  Mr. Ramirez was visibly and audibly distraught when he entered the courtroom on November 1, 2024.  *See* Dkt. No. 636 ("Plea Hr'g Tr.") at 2.  Recognizing that Mr. Ramirez was emotional and emphasizing that "[t]here's no rush at all here," the Court immediately recessed "to give [Mr. Ramirez] and [his] counsel [] the opportunity to prepare."  *Id.* at 2:8–13.  After the break, Mr. Ramirez was sworn in, and the Court began questioning him.  *Id.* at 3:12–21.  When the Court asked Mr. Ramirez if his mind was clear, Mr. Ramirez replied "[a] little fuzz," but otherwise confirmed that he understood what was happening in the proceeding.  *Id.* at 5:20–24.

Mr. Ramirez also stated that he did not "feel [he] had enough time" to discuss his case with his lawyer.  *Id.* at 6:10–14.  The Court proposed taking a second break—"I'm happy to take as much time as you'd like for you to discuss the issues with your counsel to ensure that you know what you're doing."  *Id.* at 6:16–25.  Mr. Fields interjected, clarifying that Mr. Ramirez was prepared to plead guilty that day, and that Mr. Ramirez's statement should not be understood to indicate otherwise.  *Id.* at 7:16–8:25.  But the Court would not proceed when it was not clear whether Mr. Ramirez felt prepared to do so—

> The Court:  That's fine, counsel.  I'll step down.  We have a trial on Monday; I'll see you on Monday.
>
> Mr. Fields:  No, but, your Honor—we are prepared, because we did have a full discussion about it as it related to his defense as well, so I think it's just confusion in his mind at this time, but I believe he is prepared to go forward.

4

Mr. Ramirez:  I'm prepared to go forward.  I just felt a little confusion because they brought me a plea deal on Wednesday, and I had to answer it on a Friday, and I'm still trying to digest the plea deal.

The Court:  Thank you.  That's fine.  I'm sorry.  I'm going to step down.  Mr. Ramirez is—

Mr. Ramirez:  I don't want to go to trial, and I'm pleading guilty.

The Court:  Counsel for defendant, I'm going to step down and give you the opportunity to counsel with your client.

Mr. Ramirez:  It's okay.  You don't have to step down, sir.

The Court:  Thank you.  I'm going to step down.  Counsel, please confer with your client.  I'm not going to accept a plea from a defendant who says that he is unable, does not understand the nature of the charges, and has not had the opportunity to consider them.  On this record, I'm doing to step down and allow the parties to discuss.  I'm going to take a pause for this proceeding. . . .  Thank you.

Mr. Ramirez:  I'm willing—Oh my god.

*Id.* (citation modified).

The Court adjourned for a second "extended recess," which lasted about an hour and a half, "to ensure that the defendant had sufficient time to discuss all the issues with his counsel."  *Id.* at 9:12–17.  During the recess, the court held a change of plea hearing for Mr. Francisco, who pleaded guilty.  When Mr. Ramirez's hearing recommenced, the Court "beg[a]n the colloquy from the beginning."  *Id.* at 9:18–21.  The afternoon colloquy proceeded smoothly.  *See generally id.*  The Court conducted a detailed colloquy to determine whether Mr. Ramirez's plea was knowing and voluntary and whether there was a factual basis for his plea.  *See generally id.*

Mr. Ramirez acknowledged that he understood that there was no plea agreement, *id.* at 29:11–14; confirmed that he had read, understood and discussed with his counsel the terms of *Pimentel* letter, *id.* at 31:11–21, and confirmed that he understood the guidelines range contained therein, *id.* at 31:23–18.  The Court reviewed the guidelines range set forth in the *Pimentel* letter and explained that the Government's view of the sentencing guidelines is not binding on the Court.  *Id.*

5

at 32:9–13.  Mr. Ramirez responded affirmatively to the Court's questions, admitted that he "possessed drugs with the intent to distribute," and admitted that he "possessed a firearm during the course of the conspiracy."  *Id.* at 34:2–4.  Mr. Ramirez accepted responsibility for his involvement in distributing drugs other than just Oxycodone, including methamphetamine, cocaine, heroin, and fentanyl.  *Id.* at 34.  After accepting Mr. Ramirez's guilty plea, the Court set sentencing for February 25, 2025 and referred Mr. Ramirez to probation for a presentence investigation and report.  *Id.* at 41:14.

### C.    Post-Plea Proceedings

Ultimately, Mr. Eusebio was the only Group 1 Defendant who proceeded to trial as scheduled beginning on November 4, 2024.  And trial for the "Group 2 Defendants" was cancelled after each of the Group 2 Defendants pleaded guilty.  Dkt. No. 610.

On December 23, 2024, the probation office released Mr. Ramirez's initial presentence report.  Dkt. No. 657.  On January 22, 2025, the probation office released Mr. Ramirez's final presentence investigation report.  Dkt. No. 704.  On February 20, 2025, Mr. Ramirez requested an adjournment of his sentencing because he asserted that he had not received his sentencing report.  Dkt. No. 723.  The Court granted Mr. Ramirez's adjournment request, but "observe[d] that the initial disclosure and final version of the presentence report were [already] provided to counsel."  Dkt. No. 724.

On March 12, 2025, more than four months after he pleaded guilty, Mr. Ramirez, proceeding *pro se*, moved to withdraw his guilty plea.  Dkt. No. 745.  The Court held a conference with respect to Mr. Ramirez's *pro se* motion on April 22, 2025.  At that conference, Mr. Ramirez appeared with new appointed counsel, and the Court granted Mr. Ramirez's request to file a counseled motion to withdraw his guilty plea.

Mr. Ramirez filed a counseled motion to withdraw his guilty plea on May 21, 2025, *see*

*generally* Dkt. No. 781-1 ("Mem."), in which he argues that his guilty plea was involuntary because of coercion, confusion, and ineffective legal counsel. *Id.* at 3. Specifically, Mr. Ramirez argued that his plea was rendered involuntary by ineffective assistance of counsel because his former counsel failed to adequately advise him that an earlier plea offer had expired, because he only learned the morning of his change of plea hearing that he would be pleading to a *Pimentel* letter, and because he pleaded guilty to charges of which he was innocent. *Id.* at 5–8. Mr. Ramirez also requested that the Court consider both his *pro se* and his counseled motion[1] in deciding whether to permit him to withdraw his guilty plea because his *pro se* motion "reflects his own contemporaneous account of the circumstances surrounding his plea and the breakdown with prior counsel." *Id.* at 4.

The Government filed its opposition to Mr. Ramirez's motion on June 18, 2025. *See generally* Dkt. No. 788 ("Opp'n"). The Government contended that Mr. Ramirez, has "in effect" conceded that the first three factors a Court must consider when determining whether to grant a request to withdraw a guilty plea weigh in favor of the Government, *id.* at 13, and that the record of the November 1, 2024 change of plea hearing shows that Mr. Ramirez's guilty plea was voluntary, *id.* at 18. Mr. Ramirez replied on July 2, 2024. *See generally* Dkt. No. 793. Because of the disputed facts with respect to Mr. Ramirez's communications with his prior attorneys, the Court concluded that an evidentiary hearing was necessary to resolve Mr. Ramirez's motion. Dkt. No. 808. Accordingly, the Court scheduled an evidentiary hearing for September 30, 2025. Dkt. No. 811.

## III.    FACTUAL FINDINGS

On September 30, 2025, the Court held an evidentiary hearing in connection with Mr.

---

[1] For the reasons stated on the record during the September 30, 2025 evidentiary hearing, the Court will not consider any legal arguments in Mr. Ramirez's *pro se* motion. September 30, 2025 Hr'g Tr. ("Tr.") at 15:1–12. But because Mr. Ramirez's *pro se* motion "is a substantial part of the record in this case," the Court will consider "the existence of that document" itself and "the assertions of fact that are contained in that motion" in deciding Mr. Ramirez's counseled motion to withdraw his plea. *Id.* at 15:13–16:6 (The Court: noting that the assertions of fact contained in the *pro se* motion "indicate the defendant's thinking close to the time of his decision to withdraw his plea").

Ramirez's motion to withdraw his guilty plea, with respect to the voluntariness of Mr. Ramirez's plea and with respect to the adequacy of Mr. Ramirez's former counsel's representation throughout the plea process. *See generally* Tr.  Because of the unexpected length of the testimony, the September 30, 2025 evidentiary hearing was continued to October 29, 2025 and again to November 5, 2025. *See* October 29, 2025 Evidentiary Hearing Tr. ("Tr. II"); November 5, 2025 Evidentiary Hearing Tr. ("Tr. III").  Mr. Ramirez testified at the hearing.  Darren Fields and Patrick Brackley, Mr. Ramirez's former attorneys, also testified.  Ivan Smith, a paralegal who Mr. Ramirez independently retained to assist his attorneys with his case, ultimately did not testify.  Although Mr. Ramirez's current counsel attempted to secure Ivan Smith's testimony, and the Court afforded Mr. Ramirez additional time to try to do so, counsel was ultimately unable to produce Mr. Smith.  Documents relating to plea deal negotiations, Mr. Ramirez's communications with his former counsel, and Mr. Ramirez's state of mind leading up to his guilty plea were also admitted as evidence.  The following section of this opinion contains the Court's findings of fact from that hearing.

A.    **The Witnesses**

The first witness to testify at the hearing was Mr. Ramirez himself.  The second witness to testify was Darren Fields.  At the time of the hearing, Mr. Fields had been working as a criminal defense attorney for over twenty-five years. Tr. at 153:19–25.  Mr. Fields has represented "hundreds" of individuals in criminal proceedings, with a focus on representing individuals who are going to trial. *Id.* at 154:3–6.  The final witness to testify was Patrick Brackley.

B.    **Mr. Ramirez's Retention of Mr. Brackley, Mr. Fields, and Mr. Smith**

Mr. Ramirez retained Mr. Brackley in February 2023, about a month after he was arrested. Tr. II at 378:2–4.  Mr. Brackley and Mr. Ramirez both testified that, during the course of Mr. Brackley's representation, Mr. Ramirez was disappointed with how often Mr. Brackley came to see him in jail and with what, Mr. Ramirez felt, was too little communication from Mr. Brackley with

respect to any updates in his case. *Id.* at 378:16–379:6. Mr. Brackley testified that Mr. Ramirez's frustration was "normal" for a man "charged in a case like this, when the numbers are extremely high," *id.* at 378:19–21, and that Mr. Ramirez would have likely been disappointed with the amount they were communicating "[u]nless [Mr. Brackley] [] g[o]t a cot at the jail." *Id.* at 379:12–17. The Court does not find that Mr. Brackley acted unreasonably in deciding how many meetings to schedule with Mr. Ramirez.

Nonetheless, recognizing that Mr. Ramirez might benefit from additional opinions with respect to his case, Mr. Brackley advised Mr. Ramirez to retain additional counsel. *Id.* at 379:18–19. Mr. Brackley believed bringing on additional counsel was "the best possible remedy" for Mr. Ramirez's frustration, because, in Mr. Brackley's opinion, any additional counsel would "come to the same decision and result that [he and Mr. Ramirez] had talked to," and generally help Mr. Ramirez accept some of the factual difficulties in his case. *Id.* at 379:22–380:6.

Mr. Ramirez himself hired Ivan Smith, a paralegal[2] "slash" investigator, Tr. at 154:13–8, to assist Mr. Brackley, Tr. II at 246:8–9; GX7. Mr. Ramirez knew that Mr. Smith was a paralegal, and not an attorney, when Mr. Ramirez hired Mr. Smith to join his defense team.[3] GX7 ("First, I have a

---

[2] Mr. Brackley testified that initially, he was unaware Mr. Smith was a paralegal and not an attorney. Tr. II at 373:9–12. Mr. Brackley testified that what he "came to learn is that [Mr. Smith] was a guy who would go to the jail and talk to clients similarly situated to Ramirez who were not happy" and tell those individuals what Mr. Smith believed the attorneys in the case were doing wrong. *Id.* at 380:25–381:13. And Mr. Fields testified that he believed Mr. Smith was on the Criminal Justice Act and 18-B panel for state criminal cases, although no such panels exist for paralegals. Tr. at 154:13–18. Mr. Ramirez was not under the same mistaken impression as his attorneys with respect to Mr. Smith's credentials—Mr. Ramirez knew that Mr. Smith was a paralegal when he hired Mr. Smith to join the defense team. GX7.

[3] Mr. Ramirez's letter clarifies that Mr. Ramirez knew Mr. Smith was a paralegal and that Mr. Ramirez himself hired Mr. Smith. In that letter dated September 1, 2023, Mr. Ramirez writes:

> First, I have a paralegal I want to assist you in working on my case. I just want to see how you feel about hiring him to work with you. Any cost to pay him I will cover. Please let me know or contact me once you receive this to discuss the details of this matter. The paralegal's name is Ivan Smith. He will be an asset to the team in reviewing the discovery, requesting discovery, writing briefs, and developing a competent defense strategy. This will be easier for you to have efficient work being done on my case while you're handling your other cases. I need to start seeing results or hearing about progress being made on my case.

GX7.

paralegal I want to assist you in working on the case. . . .").  Because Mr. Ramirez hired Mr. Smith

himself, with full knowledge that Mr. Smith was not an attorney, and because Mr. Smith "works for

himself," Mr. Ramirez's attorneys had no direct role in supervising Mr. Smith's work on Mr.

Ramirez's case.  Tr. II at 227:3–12 (Mr. Fields:  "[T]his is what Mr. Ramirez wanted, where he

brought Ivan Smith into the case and Ivan Smith brought me into the case."), 228:7–16.  Mr. Fields

testified that, initially, "Mr. Ramirez wanted Mr. Smith" and not Mr. Fields specifically, involved in

his case.  *Id.* at 245:17–22.  Mr. Brackley testified that Mr. Smith and Mr. Ramirez had a good

relationship, and that Mr. Smith gave Mr. Ramirez the opportunity for someone to look at his

defense and the facts of his case in a new way, although Mr. Brackley believed that Mr. Smith's

assessment of Mr. Ramirez's case was overly optimistic at points.[4]  Tr. III at 443:12–444:10.

Mr. Fields was initially introduced to Mr. Ramirez through Mr. Smith, who reached out to

Mr. Fields because of his trial experience.  Tr. at 154:13–18; Tr. II at 270:19–25.  Mr. Fields testified

that "[m]ost of the time when people call [him], they call [him] because they're looking to go to

trial."  Tr. at 154:3–6.  Mr. Fields first met with Mr. Ramirez on October 25, 2023 for an initial

consultation to discuss his case.  *Id.* at 155:6–13.  During that initial meeting, Mr. Fields explained

that he did not have bandwidth to accept Mr. Ramirez's case at the time because he had a "hectic

trial schedule" which included a trial in a homicide case and a RICO trial in the Eastern District of

New York.  *Id.* at 155:24–156:12.

Mr. Ramirez gave Mr. Fields a letter that he had also sent to Mr. Brackley "explain[ing] the

---

[4] Every witness agreed that Mr. Ramirez and Mr. Smith had a good—great, even—relationship initially.  Tr. at 158:20–21 (Mr. Fields:  "It was my understanding that Mr. Ramirez had a great relationship with Ivan Smith even before I got onboard.").  However, at some point, even Mr. Ramirez himself began to suspect that Mr. Smith's assessment of his case was overly optimistic.  In fact, Mr. Ramirez testified that "at some point [he] felt like Ivan Smith really didn't know what he was talking about" primarily because Mr. Smith's suggestions contradicted his attorneys' advice.  Tr. at 24:1–25:4.  For instance, Mr. Ramirez testified credibly that Mr. Smith encouraged him to "just go to trial [and] take the stand and tell them your point of view, tell them what really happened, don't let the government just put their narrative out there," but that "when Darren Fields came into the picture, he would say no, this" and recommend that in his opinion, Mr. Ramirez should not testify at trial.  *Id.* at 24:23–25:4.

parameters of what [Mr. Ramirez] was looking for in connection with [his] case." *Id.* at 158:21–25; GX7. In that letter, Mr. Ramirez said that he was not willing to accept responsibility for something he said he didn't do—namely, that he was only willing to plead guilty to charges relating to his involvement in the distribution of Oxycodone.[5] Tr. at 159:1–9; GX7. Also in that letter, Mr. Ramirez stated that he would not take any offer unless it fell within a certain guidelines range and that he wanted a "binding plea" with respect to the sentence that he would receive.[6] Tr. at 159:1–9; GX7 (noting that Mr. Ramirez "will only accept a plea" that is "binding"; that he will only plead to Count I only with respect to the Oxycodone; that he will not stipulate to being a "supervisor" or "leader"; and that he will "only accept a guideline range between 47 [and] 71 months").

Around November 2023, once Mr. Fields had a break in his trial schedule, he was retained by Mr. Ramirez. Tr. at 156:16. Although Mr. Ramirez was already represented by Mr. Brackley, he retained Mr. Fields because he "felt the need to just try to get [Mr. Brackley] extra help [and] because [he] wanted to know what [his] case was about . . . and [because he] wanted to have a fair chance at knowing what was going on in [his] case." *Id.* at 23:13–16. Mr. Fields explained to Mr. Ramirez that he would not be Mr. Ramirez's primary attorney because Mr. Brackley already had a pre-existing relationship with Government counsel, because Mr. Fields's current trial schedule limited his ability to meet with Mr. Ramirez and review discovery, and because Mr. Fields was not sufficiently familiar with Mr. Ramirez's case yet. *Id.* at 156:18–157:5. Mr. Fields contacted Mr. Brackley to advise Mr.

---

[5] Mr. Brackley disputes that Mr. Ramirez "consistently represented" to him that he was only willing to plead guilty to the charges related to Oxycodone because that was all Mr. Ramirez maintained, throughout the course of Mr. Brackley's representation, that he was responsible for. Rather, Mr. Brackley testified that Mr. Ramirez's statements with respect to his responsibility reflect a possible trial defense strategy they discussed. Tr. III at 429:4–7. However, Mr. Brackley testified that Mr. Ramirez consistently maintained that he did not shoot himself. *Id.* at 430:15–18. The Court credits Mr. Brackley's account of these events.

[6] Mr. Brackley credibly testified that, Mr. Ramirez's "problem wasn't with the case" or "accepting responsibility" for crimes Mr. Ramirez claimed he did not commit, "[i]t was with the numbers," Tr. III at 429:4–10 —Mr. Ramirez "did not want to go to trial and he did not want to take a plea. But if he was given a five-year plea, he would have ran [sic] from New Jersey to here to take it. He just didn't want the [fifteen-year] number, which was a significant number to give away fifteen years of your life as a minimum." *Id.* at 428:13–18.

Brackley that he had been retained. *Id.* at 157.

### C.    The First Plea Offer

On February 27, 2024, the Government made its first plea offer to Mr. Ramirez. GX1. Because of Mr. Fields's trial schedule, he did not meet with Mr. Ramirez again until April 24, 2024. Tr. at 159:15–18; Def.'s XB. Mr. Fields scheduled this April meeting with Mr. Ramirez to discuss the Government's February 27, 2024 plea offer. Tr. at 159:18–25. There was no indication that Mr. Brackley met with Mr. Ramirez prior to this April meeting to discuss the plea offer without Mr. Fields. Mr. Fields, Mr. Brackley, and Mr. Smith attended that meeting, during which Mr. Fields and Mr. Brackley explained the February 27, 2024 offer's terms to Mr. Ramirez. *Id.* at 160:1–10. Mr. Ramirez was not interested in that offer and rejected it. *Id.* at 165:3–22.

### D.    The "Revived" Plea Offer

Throughout this time, Mr. Fields, Mr. Brackley, and Mr. Smith obtained and reviewed discovery materials which they provided to Mr. Ramirez to review. *Id.* at 160:13–161:22. Mr. Brackley individually met with Mr. Ramirez on July 25, 2024, August 19, 2024, September 12, 2024, and again on September 26, 2024 to discuss his case and review discovery. GX5.

At the end of September 2024, Mr. Fields inquired as to whether the Government would be willing to do a reverse proffer identifying any evidence it had with respect to Mr. Ramirez specifically. Tr. at 162:5–163:9. On September 27, 2024, Mr. Fields met with Government counsel to discuss the possible reverse proffer. *Id.* at 163:10–164:1; GX2 (email from AUSA Andrew Jones memorializing the reverse proffer meeting). During the meeting, the Government explained its theory of the case against Mr. Ramirez and provided Mr. Brackley and Mr. Fields with additional photographs obtained from Mr. Ramirez's phone. Tr. at 164:2–23. Mr. Fields asked the Government "for the very best offer" that it could give Mr. Ramirez. *Id.*

The Government indicated that it would be willing to "revive" the February 27, 2024 plea

12

offer, on the same terms as the initial offer—offering a fifteen-year mandatory minimum—even though, by this point, it had filed the Superseding Indictment, which carried a twenty-year mandatory minimum. *Id.* at 166:13–167:3. The Government memorialized this proposal by email dated October 3, 2024. GX2. The email was clear that the Government would "have to know by next Friday, 10/11, if [Mr. Ramirez] would plead to this offer or there will be no offer." GX2; Tr. at 167:25–168:1. Mr. Ramirez confirmed that his attorneys showed him this email the same day they received it. Tr. at 43:5–6; GX11 (texts dated October 3, 2024, in which Mr. Ramirez confirms he has seen the offer).

The Government and Defendant both introduced Exhibit 11, a series of text messages between Mr. Ramirez and his friend, Joie Smith, also dated October 3, 2024. GX11. In those texts, Mr. Ramirez confirms that his attorneys communicated the existence of the "revived" offer to him on October 3, 2024, the same day the offer was memorialized over email. Tr. at 37:6–38:3; GX11 (Mr. Ramirez: "They offered me 15."). Mr. Ramirez was displeased with the offer and, as of October 3, 2024, was still planning on going to trial. *Id.* On October 6, 2024, Mr. Ramirez texted Nataly Beltre, another friend of his, that he "want[s] to take a plea with what [he's] responsible for, not what people and them speculating about me cuz of pictures and text." Tr. at 53:3–54:2; DXF. On October 7, 2024, Mr. Ramirez affirmed that, at that time, he was still planning on going to trial. DXF. On that day, Mr. Ramirez stated: "I don't really want to go to trial but they want me to be accountable for everyone's sin. I'm not with it." *Id.*

On October 8, 2024, three days before the revived plea offer would expire, Mr. Ramirez told his girlfriend to tell Mr. Fields that he "d[id]n't want that plea and that [he] [would] only [] take what [he's] responsible for . . . [i]f that's not possible [he's] going to trial." GX13. Later that day, Mr. Fields and Mr. Smith met with Mr. Ramirez to more thoroughly discuss the offer. Tr. at 168:24–169:4. During that meeting, Mr. Fields "told Mr. Ramirez explicitly, if you did something, [] you

13

should consider this offer." *Id.* at 62:14–19 (Mr. Ramirez: "I was told by Darren Fields to consider the plea."); 169:1–11. Mr. Fields explained the possible punishment Mr. Ramirez could receive if he were to accept the offer and explained that the offer carried a fifteen-year mandatory minimum. *Id.* at 169:25–170:8. Mr. Fields also explained that the offer was only available until October 11, 2024. *Id.* at 174:7–10. Mr. Fields testified credibly that he never indicated that the revived offer would remain open beyond October 11, 2024 and that he never told Mr. Ramirez that he could convince the Government to reextend the offer past that date. *Id.* at 174:4–175:22.

Mr. Ramirez was concerned that even if took the plea, his sentence could be higher than the recommended fifteen-year mandatory minimum. Mr. Ramirez asked Mr. Fields if he could "guarantee" that Mr. Ramirez would only be sentenced to fifteen years. *Id.* at 170:14–19. Mr. Fields told Mr. Ramirez that he could not guarantee any sentence and that only the judge would determine Mr. Ramirez's sentence, but also that Mr. Fields would do everything he could to walk Mr. Ramirez through the sentencing process to obtain the best outcome he could for Mr. Ramirez. *Id.* at 170:20–171:4. Ultimately, Mr. Ramirez rejected the plea offer. Tr. II at 368:1–5. Mr. Ramirez did not want to accept the offer because he was not willing to accept an offer with more than a ten-year mandatory minimum and because he "objected to the crimes" he would be required to plead to because those charges "considered other drugs that [Mr. Ramirez] felt as though he was not responsible for." Tr. at 169:11–24; DXI (text exchange between Mr. Ramirez and Korri Muckle wherein Mr. Ramirez complains that the Government wants him to admit responsibility to trafficking certain drugs, which in his view, he is not responsible for).

On October 22, 2024, Mr. Brackley and Mr. Fields met with Mr. Ramirez to discuss trial strategy and review discovery materials. GX5 (visitor log). At Mr. Ramirez's request, Mr. Fields went to meet with him again on October 24, 2025. During that meeting, Mr. Ramirez inquired as to whether he should take a plea. Tr. at 176:19–21. Mr. Fields asked whether Mr. Ramirez wanted him

to reach out to Government to see if Mr. Fields could secure an offer along the lines of the previous plea offer, but Mr. Ramirez was not sure. *Id.* at 176:22–24. While he was leaving, Mr. Fields received a text from Mr. Ramirez's girlfriend stating that Mr. Fields should not try to obtain a new plea offer absent an additional instruction to do so. *Id.* at 176:25–177:3.

On October 26, 2025, Mr. Brackley met with Mr. Ramirez to review the 3500 materials that the Government had produced a few days earlier. GX15 (Mr. Ramirez: "Lil scare[d] today Patrick coming to show me my 3500 material."). Mr. Fields and Mr. Brackley met with Mr. Ramirez again on October 30, 2024, and brought additional discovery materials with them to that meeting. Tr. at 28:3–11; 178:12–179:2; Tr. II at 368:24–369:3. Mr. Fields and Mr. Brackley reviewed those discovery materials with Mr. Ramirez and discussed trial strategy,[7] including strategy with respect to the filing of any pretrial motions. Tr. at 181–84.[8] Mr. Ramirez and his counsel concluded that it would not help Mr. Ramirez's case to file any such motions at this stage. *Id.* at 188:4.

During this meeting, Mr. Brackley told Mr. Ramirez that one of his co-defendants, Mr. Francisco had decided to plead guilty. *Id.* at 179:4–5; Tr. II at 370:5–15. Mr. Brackley testified that Mr. Ramirez and Mr. Francisco were "lifelong friends," that they readily discussed their cases with

---

[7] Mr. Ramirez testified that his counsel never discussed strategy with respect to filing any pretrial motions in his case. Tr. at 26:18. But at the evidentiary hearing, Mr. Ramirez contradicted himself and admitted that he did have substantive discussions with both his attorneys with respect to the advisability of filing a suppression motion in his case. *Id.* at 25:9–17. ("Q: Did you talk with your attorneys about filing suppression motions? [Mr. Ramirez]: Yes[,] [a]ctually both attorneys, Patrick Brackley and Darren Fields."). And Mr. Fields and Mr. Brackley both testified that they did discuss such strategy with Mr. Ramirez, and provided details as to why, in their opinions, filing any such pretrial motions would not have been in Mr. Ramirez's interest. Tr. II at 267:1–22 (Mr. Fields: "Like, [Mr. Ramirez] asked about motions, as he asked about and we talked about whether or not he was going to testify. And it came up that he has the 2006 gun case that also meant he had the 2017 driving while ability impaired or intoxicated. We could do motions *in limine* but then it came up during our reverse proffer . . . ."); 271:1–19; 277:10–278:16; 353:10–14 (Mr. Fields: "[T]here was no motion to suppress because, at trial, part of our theory is whatever was recovered from the residence may not have belonged to [Mr. Ramirez] because [] there was nothing to suggest that he owned the residence or that he rented the residence."). For example, Mr. Brackley testified that they concluded that filing a suppression motion was not advisable in Mr. Ramirez's case because "it would be against his best interests to accept responsibility for [all of the drugs and evidence found at the residence] in an affidavit." Tr. III at 450:19–25. The Court does not find Mr. Ramirez's testimony that his counsel failed to discuss trial or motion strategy with him to be credible. Rather, the Court finds that Mr. Ramirez's attorneys did discuss trial and motion strategy with Mr. Ramirez.

[8] Mr. Fields could not recall whether the discussions with respect to trial strategy and pretrial motions occurred during the October 30, 2024 meeting or during an earlier meeting. *Id.* at 181:13–15.

15

each other, and that they had decided it was better to go to trial together, as friends, rather than alone. Tr. II at 370:6–25. According to Mr. Fields, Mr. Ramirez appeared concerned by Mr. Francisco's decision to plead guilty. Tr. at 179:8–180:3; Tr. II at 259:21–25. Mr. Brackley testified that Mr. Ramirez cried when he was told that Mr. Francisco had decided to plead guilty. Tr. II at 370:19–20. Mr. Fields told Mr. Brackley that he believed Mr. Ramirez had changed his mind about going to trial and was going to decide that he wanted to plead guilty. Tr. at 179:8–180:3; Tr. II at 259:21–260:1 ("And at that point in time, I believe[d] that he probably was going to say he wanted to take a plea, even though he didn't say it that day.").

On October 31, 2024, Mr. Ramirez called Mr. Fields to inform Mr. Fields that he wished to plead guilty. Tr. at 193:17–18. Mr. Fields advised Mr. Ramirez not to "make any rash decisions" and to "hold off" until they had the chance to speak in-person over the weekend. Tr. at 193:17–23; Tr. II at 260:9–20 (Mr. Fields: "And I tried to talk him out of it, because I said, look, you can still take your plea next week. He said no, I have to do it."). But Mr. Ramirez insisted that he wanted to plead guilty and that he did not want to wait any longer. *Id.* Mr. Fields contacted Mr. Brackley to inform him of Mr. Ramirez's decision. *Id.* at 194:4–6. Mr. Brackley and Mr. Fields then contacted Government counsel to inform them of Mr. Ramirez's decision. *Id.* at 194:6–11. The Government contacted the Court, and a change of plea hearing was scheduled for the following day. *Id.* That evening, the Government sent Mr. Ramirez's counsel the *Pimentel* letter—that letter is dated November 1, 2024. *Id.* at 196:3–5; GX3.

### E.    The November 1, 2025 Change of Plea Hearing

The morning of the change of plea hearing, Mr. Fields and Mr. Brackley arrived at court early to advise Mr. Ramirez of the *Pimentel* letter and its terms. Tr. at 196:21–23; GX3. Mr. Fields and Mr. Brackley were unable to discuss the *Pimentel* letter and its terms with Mr. Ramirez until that morning because they only received the letter the night before. Tr. II at 330:2–6. Mr. Ramirez's

attorneys met with him in the cell block in the Daniel Patrick Moynihan Courthouse. During that meeting, Mr. Ramirez's attorneys read the *Pimentel* letter to him. Tr. at 46:9–11; Tr. II at 330:14–331:2 (noting that Mr. Fields showed the *Pimentel* letter to Mr. Ramirez while Mr. Ramirez was in the pens, and that he and Mr. Brackley then read the letter aloud). Mr. Fields, Mr. Brackley, and Mr. Ramirez discussed the possible consequences of pleading according to the *Pimentel* letter, the applicable twenty-year mandatory minimum sentence, and the guidelines analysis and sentencing enhancements as set forth in the letter. Tr. at 101:17–25, 197:13–198:19; Tr. II at 374:8–375:19. While Mr. Fields and Mr. Brackley were reviewing the *Pimentel* letter with Mr. Ramirez, he became extremely emotional and began repeating that he "[could not] do 20 years." Tr. at 197:15–20; Tr. III at 425:20–426:1 (Mr. Brackley: "He cried when he realized that he had a plea that the guidelines . . . [have] a 20-year minimum, and he was very unhappy about that."). That discussion lasted approximately forty-five minutes. Tr. at 101:12–19.

Mr. Fields went to speak with Mr. Ramirez before the change of plea hearing began while Mr. Ramirez was in a holding cell adjacent to the courtroom. *Id.* at 198:22–24. Mr. Ramirez was still extremely emotional. *Id.* Mr. Fields returned to the courtroom, where he communicated to the Government attorneys that Mr. Ramirez was distressed by the twenty-year mandatory minimum. *Id.* at 198:24–199:3. The Government was not moved to change its offer. *Id.* Mr. Fields returned to the cell block to speak with Mr. Ramirez. *Id.* at 199:15–17. Mr. Ramirez requested that Mr. Fields beg the Government for a fifteen-year mandatory minimum. Tr. at 199:15–17.; Tr. III at 426:7–10. Mr. Fields complied, and, as he recounted, "came out and almost got down on [his] knees [and] begged if they would possibly consider giving Mr. Ramirez a lesser amount." Tr. at 199:17–19; Tr. III at 426:9–12. The Government declined to do so. *Id.* at 199:19. Mr. Fields communicated the Government's answer to Mr. Ramirez and asked if Mr. Ramirez still wanted to plead guilty. *Id.* at 199:20–200:6. Mr. Ramirez replied that he did not want to go to trial. *Id.* at 200:6.

17

The change of plea hearing began.  Because Mr. Ramirez was emotional, the Court recessed almost immediately after the hearing began.  Plea Hr'g Tr. at 2:8–13.  The Court reconvened, but then recessed again to allow Mr. Ramirez additional time to console himself and consider the options available to him.  *Id.* at 8:12–23.  During the second, extended recess Mr. Fields, Mr. Brackley, and Mr. Smith spoke with Mr. Ramirez only briefly.[9]  Tr. at 203:22–25; Tr. II at 376:2–24.  Mr. Fields recounted that he advised Mr. Ramirez that "if he's going to take the plea, then he has to take a plea.  If he's not going to take a plea, then we're going to trial."  Tr. at 204:2–7; Tr. II at 376:20–24 (Mr. Brackley:  "[T]he conversation was that you said you [were going to plead guilty] and this is difficult [but] [y]ou're not getting the 15, this is the plea.").  Mr. Ramirez's counsel did not speak to him for the remainder of that second recess until all parties returned to the courtroom.  Tr. at 204:6–21.

Mr. Fields "spoke to [Mr. Ramirez again] briefly at the table, but [he] didn't want to browbeat Mr. Ramirez into anything one way or the other."  *Id.* at 204:24–205:6.  Mr. Fields felt that "this was [Mr. Ramirez's] time to step up and stand up[—e]ither he was going to take the plea or we were going to trial."  *Id.* at 204:24–205:6.  Mr. Ramirez again replied that he did not want to go to trial.  *Id.* at 205:12.  Mr. Fields advised Mr. Ramirez to answer the Court's questions truthfully, *id.* at 50:5–8, and Mr. Ramirez, who was calmer at this point, was able to proceed with the hearing.  *Id.* at 206:1–21.  The Court conducted a detailed colloquy to determine whether Mr. Ramirez's plea was knowing and voluntary and whether there was a factual basis for his plea.  *See generally* Plea Hr'g Tr. Mr. Ramirez responded affirmatively to the Court's questions, admitted that he "possessed drugs

---

[9] Mr. Brackley testified that this meeting occurred during the first, rather than the second, recess.  Tr. II at 404:1.  Mr. Brackley, Mr. Fields, and Mr. Ramirez all testified that this meeting did occur, but only Mr. Brackley testified that this meeting occurred during the first, and not the second, recess.  The Court understands Mr. Brackley's testimony on when this meeting occurred to be a mistaken recollection with respect to the order of events, as Mr. Brackley testified on the third day of the evidentiary hearing that the meeting occurred while the Court was handling other matters; the Court handled other matters only during the second recess.  Tr. III at 435:4–8.

with the intent to distribute," and admitted that he "possessed a firearm . . . during and in relation to the drug trafficking conspiracy." *Id.* at 116:9–12, 117:20–25. And Mr. Ramirez accepted responsibility for his involvement in distributing drugs other than just Oxycodone, including methamphetamine, cocaine, heroin, and fentanyl. *Id.* at 34.

## IV.    LEGAL STANDARD

Under Federal Rule of Criminal Procedure 11(d)(2)(B), a defendant may withdraw a guilty plea after the court accepts the plea, but before it imposes a sentence if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "Although th[e] [fair and just standard] implies that motions to withdraw prior to sentence should be liberally granted," *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992), it is well-settled that "a defendant has no absolute right to withdraw his plea of guilty." *United States v. Rosen*, 409 F.3d 535, 545 (2d Cir. 2005) (quoting *United States v. Williams*, 23 F.3d 629, 634 (2d Cir. 1994)). Rather, the standard for withdrawing a guilty plea is stringent because "society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas undermines confidence in the integrity of our judicial procedures, increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States v. Doe*, 537 F.3d 204, 211 (2d Cir. 2008) (citation modified) (quoting *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997)).

"A defendant who seeks to withdraw his or her plea bears the burden of showing that there are valid grounds for withdrawal." *United States v. Schmidt*, 373 F.3d 100, 102 (2d Cir. 2004).

> To determine whether the defendant has shown a "fair and just reason" to justify withdrawal, a district court considers: (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion; and (3) whether the government would be prejudiced by a withdrawal of the plea.

*Id.* (citation modified) (citing *United States v. Couto*, 311 F.3d 179, 185 (2d Cir. 2002)). "There is no burden on the government to show that it would be prejudiced by the withdrawal of the guilty plea

19

unless the defendant has shown sufficient grounds to justify withdrawal," *United States v. Gonzalez*, 647 F.3d 41, 56 (2d Cir. 2011) (collecting cases), but a district court may consider "the presence or absence of such prejudice." *Gonzalez*, 970 F.2d at 1100.

A district court "may also [consider] whether the defendant has 'raise[d] a significant question about the voluntariness of the original plea.'" *Schmidt*, 373 F.3d at 103 (quoting *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997)). "The voluntariness of [a] plea can be determined only by considering all of the relevant circumstances surrounding it." *Gonzalez*, 647 F.3d at 56 (quoting *Brady v. United States*, 397 U.S. 742, 749 (1970)).

"Ineffective assistance of counsel during plea negotiations can . . . undermine[] the voluntary and intelligent nature of [a] defendant's decision to plead guilty." *United States v. Arteca*, 411 F.3d 315, 320 (2d Cir. 2005) (citing *Couto*, 311 F.3d at 187). A court "evaluate[s] [a] [d]efendant's claim that [a] guilty plea was involuntary or unknowing due to ineffective assistance of counsel using the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Couto*, 311 F.3d at 187. Under the *Strickland* framework, a defendant must show that: "(1) counsel's performance fell below an objective standard of reasonableness according to prevailing professional norms; and (2) it is reasonably likely that prejudice occurred—that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Arteca*, 411 F.3d at 320 (citing *Strickland*, 466 U.S. at 687–96) (citation modified).

"To satisfy the second prong of *Strickland* in the context of plea negotiations, the defendant must show that there is a reasonable probability that were it not for counsel's errors, he would not have [pleaded] guilty and would have proceeded to trial." *Id.* (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). "Where, as here, 'defendant's specific claim is that counsel has misled him as to the possible sentence which might result from a plea of guilty, . . . the issue is whether the defendant was aware of the actual sentencing possibilities, and if not, whether accurate information would have

made any difference in his decision to enter a plea.'" *Id.* (quoting *Ventura v. Meachum*, 957 F.2d 1048, 1058 (2d Cir. 1992)).

## V. DISCUSSION

Because Mr. Ramirez has not met the stringent burden for demonstrating valid grounds for withdrawal of his guilty plea pursuant to Federal Rule of Criminal Procedure 11(d)(2)(B), his motion is denied.

### A. Legal Innocence

Because Mr. Ramirez has affirmatively admitted his guilt for some of the charged conduct, and because the Court does not credit Mr. Ramirez's assertions that he lied repeatedly during his plea allocution, the first factor weighs against allowing Mr. Ramirez to withdraw his guilty plea. At the outset, Mr. Ramirez's own *pro se* motion[10] contradicts his claim of legal innocence because, in that motion, Mr. Ramirez admits to at least some of the charged conduct.[11] *See generally* Dkt. No. 745. In his *pro se* motion, Mr. Ramirez explicitly "does not deny that he engaged in the possession, sale, and/or distribution of a controlled substance." Dkt. No. 745 at 2. Instead, Mr. Ramirez acknowledges "responsibility for his part of possessing and profiting from the sale of Oxycodone in what perhaps was a free-for-all open drug market." *Id.* at 3. The Court cannot conclude that Mr.

---

[10] For the reasons discussed above, *supra* note 1, the Court considers only "the existence of" Mr. Ramirez's *pro se* motion and "the assertions of fact that are contained in that motion" in deciding Mr. Ramirez's counseled motion to withdraw his plea. Tr. at 15:13–16:6.

[11] In *Overton*, the Second Circuit held that the district court "properly concluded that [the defendant's] assertion of legal innocence lacked evidentiary support, [] because the alleged *Brady* material was not exculpatory *as to all* of [the defendant's] charged conduct." *United States v. Overton*, 24 F.4th 870, 879 (2d Cir. 2022) (emphasis added). Here, as in *Overton*, Mr. Ramirez does not contend that he is innocent of all of the charged conduct—just the opposite, he asserts that he is responsible for the conspiracy to distribute Oxycodone, but not the other drugs at issue in the conspiracy. As Mr. Brackley explained at the evidentiary hearing, Mr. Ramirez's "defense theory was a multiple conspiracies defense." Tr. II at 369:13-17 (Mr. Brackley: "His theory was that he was a lone individual who had a minor participant who only sold drugs and at a very small level and he was not connected to any of the other individuals who were arrested."). Because the Court does not conclude that Mr. Ramirez is being honest now and that he was actually lying during his plea allocution, the Court need not address whether Mr. Ramirez must assert his innocence of all criminal conduct involved in the conspiracy charge, or whether it is sufficient for Mr. Ramirez to assert that he is innocent of the conspiracy for which he accepted responsibility—the object of which included the sale of multiple types of drugs—because he was only involved in a different conspiracy with a more limited object—the sale of Oxycodone alone.

Ramirez has adequately asserted his legal innocence, when Mr. Ramirez himself admits that he was responsible for, at minimum, the possession and sale of Oxycodone.

And on this record, the Court cannot credit Mr. Ramirez's conclusory assertions of innocence. "A criminal defendant's self-inculpatory statements made under oath at his plea allocution carry a strong presumption of verity and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." *Adames v. United States*, 171 F.3d 728, 732 (2d Cir. 1999) (internal citations omitted). Mr. Ramirez acknowledged his guilt during his November 1, 2024 plea allocution. And Mr. Ramirez specifically accepted responsibility for his role in distributing drugs other than just Oxycodone. While under oath, Mr. Ramirez admitted that he "possessed drugs with the intent to distribute," including methamphetamine, cocaine, heroin, and fentanyl, and admitted that he "possessed a firearm during the course of the conspiracy." Plea Hr'g Tr. at 34:2–4. Mr. Ramirez's "statements under oath during [the] plea allocution . . . must be given presumptive force of truth." *Mejia v. United States*, 740 F. Supp. 2d 426, 429 (S.D.N.Y. 2010) (quoting *United States v. Hernandez*, 242 F.3d 110, 112–13 (2d Cir. 2001)). And the evidence obtained from Mr. Ramirez's phone showing packages of white powder—which is clearly not Oxycodone—undermines the credibility of Mr. Ramirez's assertions that he only had knowledge of the conspiracy to distribute Oxycodone. This is not just the Court's assessment: Mr. Brackley testified that he "believe[d] the photographs were of cocaine." Tr. III at 414:9–10. The contradictory testimony that Mr. Ramirez offered during the evidentiary hearing is less credible because it was self-serving.

Because Mr. Ramirez does not identify any credible facts or evidence supporting his legal innocence claim nor does he explain why he is innocent, the Court cannot conclude on this record that Mr. Ramirez's earlier admissions of guilt were untruthful.[12] *See generally* Dkt No. 781-2. A

---

[12] The Court does not credit Mr. Ramirez's assertions that he lied throughout his plea allocution in response to the Court's questioning. Tr. at 108:3–25. The Court does not find Mr. Ramirez's testimony on this point, absent additional corroboration, to be credible because Mr. Ramirez "has, by his own admission, repeatedly lied to the Court under oath,

defendant's "mere assertion of innocence is per se insufficient to support" a claim of legal innocence. *United States v. Fernandez*, 734 F. Supp. 599, 604 (S.D.N.Y. 1990), *aff'd*, 932 F.2d 956 (2d Cir. 1991). Rather, "[a] claim of innocence . . . must be supported by evidence." *United States v. Overton*, 24 F.4th 870, 879 (2d Cir. 2022). The court must "be convinced that there are legally cognizable defenses to the crime charged to exculpate the defendant." *United States v. Thomas*, 651 F. Supp. 3d 685, 693 (S.D.N.Y. 2023) (quoting *Fernandez*, 734 F. Supp. at 604). Although Mr. Ramirez now affirms that "[a]t the change of plea hearing, [he] admitted to crimes that [he was] innocent of," he provides no further explanation beyond that single sentence. Dkt. No. 781-2 ¶¶ 33, 38.

Mr. Ramirez has not made a factual argument that supports a legally cognizable defense—he merely asserts that he is innocent in a conclusory manner.[13] *Thomas*, 651 F. Supp. 3d at 693; *see* Mem. at 8 (arguing that Mr. Ramirez "ultimately pleaded guilty to facts that were untrue and that he did not commit"). The Court does not find Mr. Ramirez's conclusory statements to be credible. Because Mr. Ramirez "present[s] no evidence supporting his claim," the Court affords Mr. Ramirez's unsupported assertion of innocence "little credit." *United States v. Zheng*, No. 21-CR-417-6, 2024 WL 462595 at *6 (E.D.N.Y. Oct. 30, 2024) (quoting *United States v. Lam Peralta*, 729 F. App'x 68, 70 (2d Cir. 2019)). Mr. Ramirez's "bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." *Torres*, 129 F.3d at 715. Accordingly, because Mr. Ramirez has acknowledged responsibility for some of the charged conduct, and because the Court does not find his assertions of innocence to be credible, the first factor weighs against allowing Mr. Ramirez to withdraw his guilty plea.

---

and so the Court does not take his current assertions of innocence as necessarily truthful." *United States v. Garcia*, 648 F. Supp. 3d 480, 485 (S.D.N.Y. 2022).

[13] According to Mr. Fields, throughout the course of his representation, Mr. Ramirez maintained that he was not responsible for some of the charges against him, and that Mr. Ramirez was only willing to plead guilty to those charges he felt he was actually responsible for. Tr. at 169:22–24. Mr. Ramirez's representations to his counsel do not alter the Court's analysis here because, as Mr. Fields noted, "[w]hat [Mr. Ramirez] told [his counsel] and what he did are two separate things." Tr. II at 345:7–11.

B.      Elapsed Time

The second factor—the amount of time that has elapsed between the plea and the motion— also weighs against allowing Mr. Ramirez to withdraw his plea.  The timing of Mr. Ramirez's motion is important because although "a swift change of heart may indicate a plea made in haste or confusion" waiting months to file a motion to withdraw "supports the district court[] finding that [a] plea was entered voluntarily." *United States v. Doe*, 537 F. 3d 204, 213 (2d Cir. 2008).  Mr. Ramirez filed his *pro se* motion[14] on March 12, 2025—more than four months after he pleaded guilty on November 1, 2024, and nearly two and half months after he received his final presentence report on January 22, 2025. *Fernandez*, 734 F. Supp. at 602, *aff'd*, 932 F.2d 956 (2d Cir. 1991) (concluding that a defendant who "waits to withdraw his plea until after learning his sentencing range from the presentence report" can be ascribed an "improper motive" for moving to withdraw because such a defendant is possibly attempting "to obtain a second chance after learning his sentence").  The timing of Mr. Ramirez's motion is suspect because the presentence report disclosed a guidelines range of twenty-years to life—this high range gave Mr. Ramirez good reason to change his position. Dkt. No. 704.  Mr. Brackley consistently and credibly testified that what Mr. Ramirez was most concerned with was "the number, which was a significant number to give away 15 years of [his] life as a minimum." Tr. III at 428:15–18.  Indeed, "the number" was what led Mr. Ramirez to reject the first two plea offers.

"Four months is simply too long a period to support a claim that the plea was made in haste or confusion." *Fernandez*, 734 F. Supp. at 603, *aff'd*, 932 F.2d 956 (2d Cir. 1991); *see also Overton*, 24 F.4th at 879–80 (collecting cases) (concluding that a five-month delay between the plea and motion

---

[14] At the evidentiary hearing, the Government represented that it had, in its own briefing, "been treating [March 12, 2025] as kind of the stop of the untimeliness of the motion." Tr. at 13:4–12.  Because the Government does not oppose determining timeliness from the date of the filing of Mr. Ramirez's *pro se* motion and because the Court will consider that motion "for the timing of its presentation to the Court," *see supra* note 1, the Court analyzes timeliness from the date of the filing of the *pro se* motion. *Id.* at 12:19–20.

to withdraw was "substantial"); *United States v. Albarran*, 943 F.3d 106, 123 (2d Cir. 2019) (finding that a four-month lapse between a defendant's guilty plea and his motion to withdraw supported the district court's discretionary denial of the motion). Because Mr. Ramirez waited nearly four and a half months after pleading guilty to file his motion to withdraw, and because Mr. Ramirez only moved after he had already obtained a copy of his presentence report setting forth a guidelines range for sentencing, the second factor also weighs against allowing Mr. Ramirez to withdraw his guilty plea.

### C.    Prejudice

Next, in considering any prejudice to the Government in granting withdrawal, this factor weighs against withdrawal, but only slightly, because any prejudice to the Government is offset by the substantial similarity between Mr. Ramirez's and Mr. Eusebio's cases and by the possible need to litigate aspects of Mr. Ramirez's case regardless of the outcome of this motion. There is some prejudice to the Government here—the Government would be prejudiced with respect to its anticipated witnesses because allowing Mr. Ramirez to withdraw his guilty plea could "reopen an issue of potential intimidation of [] witness[es] whom the Government would expect to call to testify at trial." *Garcia*, 648 F. Supp. 3d at 485. The risk of witness intimidation in this case is more than speculative because, during Mr. Eusebio's trial, the cooperating witness was threatened in court while he was testifying. "[L]aw enforcement in the back of the courtroom has observed during [the cooperating witness's] testimony [] one person in the gallery making threatening gestures."[15] November 7, 2024 Trial Tr. at 403:16–21. The Court excluded that individual from the courtroom for the duration of the cooperating witness's testimony. *Id.* Because Mr. Eusebio's trial proceeded similarly to how any trial in Mr. Ramirez's case would proceed, it is possible that the witness

---

[15] Specifically, law enforcement observed that the gallery member was making "finger guns" at the head of another person in the gallery "while looking at [the cooperating witness's] direction." November 7, 2024 Trial Tr. at 403:16–21.

intimidation issue will arise again.

There is some prejudice to the Government in asking it to redo or reprepare for trial here when Mr. Ramirez could have been tried concurrently with Mr. Eusebio, as originally scheduled. That said, any prejudice in asking the Government to redo or reprepare for trial is offset by the substantial overlap between Mr. Ramirez's and Mr. Eusebio's cases. Any such prejudice is lessened because "the Government already prepared for trial once in this case" under substantially similar facts and on the same indictment. *United States v. Velissaris*, No. 22-cr-105, 2023 WL 2875487 at *19 (S.D.N.Y. Apr. 10, 2023), *aff'd* No. 23-cr-6379, 2024 WL 4502001 (2d Cir. Oct. 16, 2024). Mr. Eusebio, one of Mr. Ramirez's Group 1 co-defendants, was tried before a jury as scheduled beginning on November 4, 2024. As the Government concedes, "[b]ecause of the close working relationship between [Mr.] Eusebio and [Mr. Ramirez] in the 174[th] Street Crew, the conduct of the trial was virtually unchanged by [Mr. Ramirez's] absence."[16] Opp'n at 16. Because much of the evidence that would be introduced in Mr. Ramirez's case should he be permitted to withdraw his plea and proceed to trial was already introduced, prepared, and presented during Mr. Eusebio's trial, any prejudice in asking the Government to redo that trial is diminished as the Government has already done most of the work.

And any prejudice to the Government resulting from the need for its attorneys, experts, and witnesses to "re-familiarize themselves"[17] with the case or from reproducing certain witnesses is

---

[16] The facts of this case show that proceeding to trial would not "depriv[e] the Government of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it," because the Government has already largely completed much of the substantive trial preparation and because Mr. Ramirez's plea did not "benefit" the Government by eliminating the need for trial preparation—the Government still tried Mr. Eusebio. *See United States v. Lopez*, 385 F.3d 245, 254 (2d Cir. 2004).

[17] Because the same prosecutors have worked on this case since the beginning, and because—should the Court allow Mr. Ramirez to withdraw his plea and proceed to trial—those same prosecutors would also work on that trial, there is less prejudice to the Government in retrying this case. The Court assumes that those prosecutors would need to do some preparation in advance of trial, but that any such preparation would be significantly less intensive than if those prosecutors were looking at the case for the first time. *See Velissaris*, 2023 WL 2875487 at *19 (concluding that the "prejudice to the Government . . . weighs strongly against granting the withdrawal [because] . . . two of the three prosecutors who worked on the case have left the U.S. Attorney's Office.").

offset by the fact that, even if Mr. Ramirez's guilty plea is not withdrawn, the Government may need to re-prepare and reproduce some witnesses anyway, should this case require a *Fatico* hearing.[18] *See Garcia*, 648 F. Supp. 3d at 485 (concluding that prejudice to the Government was weaker because "the Government made plain that, even if [the defendant's] plea was not withdrawn, it planned to call . . . [the same] witness[es] anyway in connection with a planned *Fatico* hearing"). In sum, there is some prejudice in requiring the Government to "prepare for trial [again,] already having done so once"—but any such prejudice is potentially offset by the Government's need to prepare regardless of the outcome of Mr. Ramirez's current motion to withdraw. *Albarran*, 943 F.3d at 123. Accordingly, the prejudice factor weighs against withdrawal, but only slightly.

### D.       Balancing of the Factors

Because all three factors weigh against him, Mr. Ramirez has not shown "a fair and just reason" to justify withdrawal. *Schmidt*, 373 F.3d at 102–3. Accordingly, Mr. Ramirez has not met his burden to show that there are valid grounds to allow him to withdraw his guilty plea on this basis.

### E.       Voluntariness and Ineffective Assistance of Counsel

Mr. Ramirez argues that his guilty plea was involuntary for three reasons. First, Mr. Ramirez argues that his plea was involuntary because he was coerced and pressured by his former counsel. Mem. at 8. Second, Mr. Ramirez argues that his plea was not voluntary because he was confused and misinformed "about the nature of the charges [against him and] the plea terms." Reply at 3; Mem. at 6. Third, Mr. Ramirez asserts that his plea was rendered involuntary because his former attorneys were ineffective. *Id.*

---

[18] Because Mr. Ramirez argues he is only responsible for those portions of the alleged conspiracy involving the Oxycodone, but his final presentence report includes a guidelines calculation based on the weight of all the drugs at issue, including those Mr. Ramirez contends he was not responsible for, the Court anticipates that Mr. Ramirez may seek to challenge any guidelines calculation based on the cumulative weight of the other drugs at a *Fatico* hearing. Mr. Fields testified that Mr. Ramirez's former defense team had considered this possible strategy—"we even considered doing an open plea at some point where we would request potentially a *Fatico* hearting after he did an open plea." Tr. at 208:6–13.

Because Mr. Ramirez "argues that [his] plea was not voluntary . . . the [C]ourt must focus on voluntariness." *Doe*, 537 F. 3d at 211.  A plea is involuntary "if it is the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally." *Albarran*, 943 F.3d at 124.  At the outset, the Court again notes that, it is the law of this Circuit that a defendant's testimony at his plea allocution "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made."[19]  *United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001) (collecting cases).

### a.  Coercion

First, Mr. Ramirez's assertion that his guilty plea was coerced because counsel "presented him with an ultimatum—either plead guilty immediately or go to trial . . . and 'get 40 years imprisonment'" is not credible[20] and, accordingly, does not render his plea involuntary.  Mem. at 8.  It was apparent that Mr. Ramirez was distraught when his change of plea hearing began.  But the Court does not find that Mr. Ramirez was upset because he was pressured or coerced.  Despite his emotional state at the start of the hearing, Mr. Ramirez was steadfast throughout the hearing—he

---

[19] The well-settled principal that a defendant's testimony at his plea allocution "carries [] a strong presumption of accuracy," *Juncal*, 245 F.3d at 171, is relevant to determining both whether Mr. Ramirez has sufficiently alleged his legal innocence and whether the Court should afford Mr. Ramirez's later, contradictory statements that his guilty plea was involuntary because of coercion or ineffective assistance of counsel any weight.

[20] Mr. Ramirez's description of his mental and emotional state following conversations with his former counsel as "pressured . . . and [his] characterization of his attorney[s'] efforts to persuade him to plead guilty as 'coercive tactics,' must be viewed in light of" the fact that "[g]uilty pleas are generally the result of a weighing of highly undesirable-coercive-alternatives rather than a soul-cleansing urge to confess." *Juncal*, 245 F.3d at 173–74.  For example, Mr. Ramirez attests that his "attorneys presented the option as pleading guilty as the only viable option due to the case's complexity and scale—they made me feel as if I had no choice but to plead guilty" and that "the only reason [he] pled guilty was [because of that] pressure." Dkt. No. 781-2 ¶¶ 16, 35. Mr. Fields did "explicitly" advise Mr. Ramirez, after the Government had agreed to extend the initial plea offer, that "if [he] did something, that [he] should consider th[at] offer." Tr. at 169:4– 11.  "It is [] commonplace that a defendant will feel 'coerced' in the lay sense of the word by an attorney's recommendation to plead guilty rather than proceed to trial.  Such recommendations often come with predictions of almost inevitable conviction at trial followed by a long jail sentence.  A feeling of duress is hardly an unusual outcome of such deliberations." *Juncal*, 245 F.3d at 173–74; Tr. at 115:20–22 (Mr. Ramirez:  "Because I was actually relying on my lawyers.  I was at the mercy of my lawyers.  That's the whole point of hiring the lawyer.").

28

wanted to plead guilty. Mr. Ramirez interrupted the Court at numerous points during the morning session of his hearing, insisting that he "d[id]n't want to go to trial, and I'm pleading guilty." Plea Hr'g Tr. at 8:6–7.

The Court would not accept Mr. Ramirez's plea at that time, stepping down to afford Mr. Ramirez additional time to consider his plea, because Mr. Ramirez was unable to confirm that he that he had adequate time to consider either the charges against him. *Id.* at 8:12–22. Mr. Ramirez attempted to convince the Court that a recess was not necessary—"[i]t's okay you don't have to step down sir." *Id.* at 8:10–11. And when the Court did recess, Mr. Ramirez interjected, again, attempting to convince the Court he was ready to plead:

> The Court: On this record, I'm going to step down and allow the parties to discuss. I'm going to take a pause for this proceeding, and we'll move forward with another proceeding that was scheduled at noon, so we will recommence this proceeding following the proceeding that will take place at noon.
>
> Mr. Ramirez: I'm willing—Oh my god.

*Id.* at 8:18–25 (citation modified). Mr. Ramirez's insistence that the Court accept his plea does not suggest he was coerced. Rather, Mr. Ramirez insistence reflects his desire to avoid trial, which would start after the weekend, and which Mr. Ramirez would now proceed through alone, without the camaraderie of his lifelong friend, Mr. Francisco, who was also pleading guilty that same day.[21] Tr. at 106:5–8 ("Q: All right. So even before he left the bench, you were telling him, I really don't want to do this, please don't leave; right? Mr. Ramirez: Correct.").

And finally, the Court does not credit Mr. Ramirez's assertion that counsel told him that if he failed to plead guilty, he was "guaranteed" to receive a forty-year sentence. Neither Mr. Ramirez's "affidavit nor his brief [nor anything at the evidentiary hearing] offer[s] any evidentiary support for his claim[]" that counsel threatened that if he did not plead guilty he would face forty

---

[21] Mr. Fields testimony supports that Mr. Ramirez was intent on pleading guilty and avoiding trial. Mr. Fields testified that Mr. Ramirez insisted on the day of his change of plea hearing that he "can't go to trial." Tr. at 205:11–12.

years imprisonment. *United States v. Bonilla*, 17 Fed. Appx. 11, 13 (2d Cir. 2000). Rather, Mr. Ramirez's allegations that counsel threated him are "directly contradicted by his clear statements at allocution." *Gonzalez*, 970 F.2d at 1101; *Velissaris*, 2023 WL 2875487 at *14, *aff'd*, 2024 WL 4502001 (2d Cir. Oct. 16, 2024).[22]

During his allocution, Mr. Ramirez affirmed[23] that he understood that "if [his] lawyer or anyone else has attempted to predict what [his] sentence will be, that [] prediction could be wrong," Plea Hr'g Tr. at 16:2–4, that he understood that "the sentence ultimately imposed may be different from any estimate that your attorney may have given [him], *id.* at 26:25–27:3, and that he understood that "no one, not your lawyer, not the government's lawyer, really no one can you any assurance of what your sentence is going to be," *id.* at 27:10–16. And Mr. Ramirez affirmed that no had "[m]ade any promise to [him] or . . . induce[d him] to plead guilty, that no one had "threatened [him] or forced him to plead guilty," and that no one had "made a promise to [him] as to what [his] sentence would be." *Id.* at 33:2–15. Nothing in Mr. Ramirez's answers indicates that he was under any pressure to plead guilty.[24] *See Thomas*, 651 F. Supp. 3d at 694 ("Defendant's allegation that he was coerced into pleading guilty because [his] [f]irst Counsel told Defendant . . . that the Government had said it would "bury" Defendant if he proceeded to trial is unpersuasive because after that break, Defendant unequivocally swore that he was pleading guilty voluntarily and of his own free will.").

---

[22] The Court in *Velissaris*, found the defendant's assertion that "one of his attorneys told him that he might be facing a term of imprisonment of up to 30 years, but with a plea he might be sentenced to as low as six years' imprisonment" insufficient to render his plea involuntary because "the Court explained at length during [defendant's] plea allocution that any representations his attorneys had made about his sentence could be incorrect, and that, even if his sentence was different from what his attorneys told him, he would be bound by the plea of guilty." *Velissaris*, 2023 WL 2875487 at *14. The facts here are largely indistinguishable from those in *Velissaris*.

[23] Mr. Ramirez also affirmed that he was fully satisfied with his lawyer's representation, that he understood he had "the right to plead not guilty," Plea Hr'g Tr. at 16:2–4, that he had "the right to change his mind and to plead not guilty and to go to trial," *id.* at 18:6–9, and that he was "willing to give up [his] right to a trial," *id.* at 19:13–15. And at the evidentiary hearing, Mr. Ramirez asserted that he confirmed he was satisfied with his counsels' performance because he did not want the Court to "stopped [sic] the proceedings of me pleading guilty." Tr. at 51:9–10.

[24] Mr. Ramirez's decision to hire Mr. Fields because Mr. Ramirez believed that Mr. Brackley was too overwhelmed to manage his case, "is evidence that [Mr. Ramirez] exercise[d] judgment about the adequacy of his counsel's representation and, more generally, that he can weigh his options rationally" and that counsel did not "overpower" or coerce Mr. Ramirez. *Velissaris*, 2023 WL 2875487 at *14.

The Court finds Mr. Fields's and Mr. Brackley's testimony on this point credible.[25]  Mr. Fields explicitly disclaimed ever making this statement.  Tr. II at 361:1–5, 361:12–14.  Mr. Fields testified that Mr. Ramirez specifically asked Mr. Fields if he could "guarantee" that Mr. Ramirez would only serve fifteen years if he accepted the Government's plea offer.  Mr. Fields told Mr. Ramirez that he could not guarantee any particular sentence—irrespective of whether Mr. Ramirez went to trial or accepted the Government's plea offer—and that only the judge "will decide [his] sentence."  Tr. at 170:14–23.  Mr. Brackley's testimony supports Mr. Fields' recollection that neither attorney ever threatened Mr. Ramirez that he was guaranteed to face a forty-year sentence should Mr. Ramirez go to trial.  Although Mr. Brackley admitted that he "often told" Mr. Ramirez that "if he got convicted [following trial], he would get significantly more than what he would be taking on any plea offer or on a *Pimentel*," the Court finds that Mr. Brackley never promised a particular sentence, including a guaranteed sentence of forty years.[26]  Tr. III at 456:21–457:2.  On this record, the Court cannot credit Mr. Ramirez's assertion that his attorneys threatened him with a potential forty-year sentence if he did not immediately plead guilty.  Accordingly, Mr. Ramirez's guilty plea was not rendered involuntary because of pressure or coercion.

---

[25] In responding to the question as to whether he ever told Mr. Ramirez "that [he] could [get] [Mr. Ramirez] a better plea deal," Mr. Fields testified that "ethics is everything for h[him] as an attorney.  And [he] could never ever tell a single client—in his 25 years [he's] never told a client, unless [he] got a verification from a prosecutor or a judge what they could get."  Tr. at 175:10–175.

[26] On the final day of the evidentiary hearing, the following exchange during Mr. Brackley's cross-examination:

> Q.  So you told [Mr. Ramirez] if he goes to trial he would definitely get 40 years.  That's what you said to him?
> A.  I often told him that.

Tr. III at 456:25–457:2.  Standing alone, Mr. Brackley's response seems to indicate that he did in fact tell Mr. Ramirez that if he went to trial, Mr. Ramirez was "guaranteed" a forty-year sentence.  Read in context however, the Court understands Mr. Brackley's response that he "often told [Mr. Ramirez] that," as indicating that Mr. Brackley often told Mr. Ramirez that he could face a lengthier sentence if he proceeded to trial rather than accepting a plea deal, not an affirmation that Mr. Brackley told Mr. Ramirez that he would definitely get forty years if Mr. Ramriez proceeded to trial.  *Id.* at 456:21–457:2.  Indeed, Mr. Brackley testified earlier along similar lines, stating that he told Mr. Ramirez that "if you plead guilty, you're going to do significantly better than if you go to trial," and Mr. Brackley specifically disclaimed ever promising Mr. Ramirez that he would receive any particular sentence if he went to trial.  Tr. II at 377:2–10.

### b. Confusion

Mr. Ramirez's argument that his guilty plea was involuntary by reason of confusion—because until that morning, he believed he was pleading to the earlier offer and not the Superseding Indictment—is unavailing. Again, Mr. Ramirez was emotional at the time the plea hearing began. As a result, the Court recessed twice, the second time for over an hour and half, to afford Mr. Ramirez additional time to consider the plea and the charges against him. Those lengthy recesses afforded Mr. Ramirez additional time to console himself and thoughtfully consider the options available to him—plead or proceed to trial on Monday. *See Thomas*, 651 F. Supp. 3d at 694 (holding that the defendant's "belated contention that he was not given adequate time or counsel to understand the process" was "belied . . . [because] during the plea he was given breaks—including one that lasted approximately fifteen minutes").

And when his allocution recommenced after the second, approximately ninety-minute recess, Mr. Ramirez affirmed that he understood what was happening, Plea Hr'g Tr. at 14:1–3, that he had received a copy of the indictment and reviewed the charges against him with his counsel, *id.* at 14:8–13, and that his attorneys explained the consequences of pleading guilty, *id.* at 14:14–19. Even if the Court were inclined to credit Mr. Ramirez's "bald statements" that he was confused during his allocution, *Torres*, 129 F.3d at 715, "the Court's detailed description of the charges against Defendant, the consequences of pleading guilty, and his potential sentence exposure, as well as the Government's recitation of the elements of the crimes and proffer of what the evidence at trial would consist of" should have corrected any confusion remaining in Mr. Ramirez's mind. *See Thomas*, 651 F. Supp. 3d at 694.

And Mr. Ramirez's assertion that he was confused is not credible because it is inconsistent with his behavior during his change of plea hearing and because there is extensive evidence that Mr. Ramirez understood the plea deal and nuances of the issues involved. First, Mr. Ramirez's distress

during his plea allocution belies any assertion that he was confused.  Mr. Ramirez was not emotional because he did not understand what was happening.  Mr. Ramirez was emotional because he understood exactly what had happened and what would happen—the plea deal he mistakenly thought was available had expired and he could either plead to the Superseding Indictment or proceed to trial.  Dkt. No. 781-2 ¶¶ 22–26; Tr. III at 425:20–426:1 (Mr. Brackley:  "He cried when he realized that he had a plea that the guidelines described as 15 years . . . [a]nd then when he decided to take it, he came back to court and was told that that plea is no longer available because he turned it down, and it's now, the guidelines are gelling into a 20-year minimum, and he was very unhappy with that.").  Mr. Ramirez admitted that, although he came to court that day intending to accept the then-expired plea offer, by the time he appeared for his change of plea hearing, he knew that the plea offer was no longer available.  Tr. at 44–45.

Mr. Fields's testimony at the evidentiary hearing underscores the reason that Mr. Ramirez was emotional that day—not because Mr. Ramirez was confused or failed to understand what was happening—but because Mr. Ramirez had realized that his only option was to plead to the indictment or go to trial on Monday.  *Id.* at 103:1–7.  After the first recess, Mr. Ramirez requested that Mr. Fields "please go and beg [the Government] and see if [he] can get [the mandatory minimum] down to 15."  *Id.* at 199:15–17.  Mr. Fields, who was "almost crying with" Mr. Ramirez, "came out and almost got on [his] knees and begged [the Government to] possibly consider giving Mr. Ramirez a lesser amount."  *Id.* at 199:17–19.  The Government declined to reduce the mandatory minimum, and when Mr. Fields retuned to communicate the Government's response to Mr. Ramirez, Mr. Ramirez "was still heartbroken."  *Id.* at 199:22–23.

And because there is extensive evidence that Mr. Ramirez understood what he was pleading to and took an active role in preparing his defense, that evidence belies Mr. Ramirez's assertion that he did not understand the consequences of a plea.  At the evidentiary hearing Mr. Ramirez

confirmed he had seen and read the Superseding Indictment and that he understood the charges contained therein. *Id.* at 110:9–14, 112–113. And Mr. Fields testified credibly that Mr. Ramirez took an active role in assisting with his own defense—"whenever [they] met, Mr. Ramirez would bring certain things to [Mr. Fields's] attention as it relate[d] to his case." Tr. at 177:13–21 (Mr. Fields: noting that, "a lot of times defendants know their case sometimes better than the lawyers, and sometimes they see things we don't see."). For instance, "a lot of the discovery that [Mr. Fields] received was from Mr. Ramirez personally," *id.* at 160:18–21, and Mr. Ramirez even "pointed out certain things to" Mr. Fields within that discovery material that Mr. Ramirez believed might help his defense. *Id.* at 161:21–22.

Mr. Fields's assessment of Mr. Ramirez's involvement in, and understanding of, the charges and evidence against him accords with Mr. Brackley's rendition of events. Mr. Brackley opined that Mr. Ramirez was "very intelligent" and willing to speak his mind. Tr. II at 375:1–5. The Court credits Mr. Brackley's testimony that any tension in his relationship with Mr. Ramirez was partly attributable to Mr. Ramirez's intelligence and understanding of his case. *Id.* at 375:1–5 ("[With a man like Ramirez who understands a lot of it. . . .").

And both the letter Mr. Ramirez gave to Mr. Fields and Mr. Brackley and Mr. Ramirez's text messages show Mr. Ramirez's sophisticated knowledge of the charges against him and understanding of guidelines and mandatory minimums. *See, e.g.*, GX7 ("Lastly, I want to provide you with the terms of any plea agreement that I'd accept: I would like to have a FRCP 11(c)(1)(C) 'binding' plea (I've been told that the 2d [C]ircuit doesn't give out 'binding' pleas. Is that true? Why don't they? Is that legal?); . . . I will only accept a guideline range between 47–71 months."); GX 13 (Mr. Ramirez: "[A]nd only oxycodone that I'm reasonable foreseeable [sic] for and no 924 c under 10 year[']s eligible for all programs if that's not possible I'm going to trial !!!!"). Because Mr. Ramirez had a sophisticated understanding of the charged against him, and because he took an active role in

34

assisting with his defense, the Court declines to credit his assertions that he did not fully understand the consequences of his plea.

There is simply no indication on this record, other than Mr. Ramirez's own assertions to the contrary, that Mr. Ramirez "entered [his] plea without full knowledge of the implications." Dkt. No. 781-2 ¶ 36. Because the Court recessed twice to afford Mr. Ramirez ample time to pause and consider his options, because the Court's detailed plea colloquy corrected any remaining confusion, and because Mr. Ramirez's assertion of confusion as to what he was pleading to is belied by his behavior during his change of plea hearing and by his pre-plea communications which evidence a sophisticated understanding of the case and options available to him, Mr. Ramirez has failed to show that any confusion raised a substantial question about the voluntariness of his plea that would justify withdrawal.

### c. Ineffective Assistance[27]

For the reasons discussed above, the Court cannot conclude that Mr. Ramirez's testimony during the plea allocution was dishonest. *Juncal*, 245 F.3d at 171. To the contrary, the Court believes Mr. Ramirez's earlier testimony to have been true. The Court could end its analysis here. But, to afford Mr. Ramirez every opportunity to present his argument, the Court evaluates Mr. Ramirez's claim that his counsel were ineffective under *Strickland* and finds that Mr. Ramirez has not met his burden under the first prong of the *Strickland* framework because his "counsel[s'] performance [did not] fall below an objective standard of reasonableness according to prevailing professional norms." *Arteca*, 411 F.3d at 320 (citing *Strickland*, 466 U.S. at 687–96). Neither Mr. Brackley's nor Mr. Fields's performance fell below an objective standard of reasonableness because there is no indication that they failed to communicate the plea offers to Mr. Ramirez, failed to

---

[27] Mr. Ramirez's claims that his guilty plea was involuntary because of either coercion or confusion overlap with his assertion that his plea was involuntary because of his counsels' ineffective assistance. The Court has addressed these portions of Mr. Ramirez's argument separately.

apprise him of the second offer's expiration, nor did Mr. Fields err in deciding to give Mr. Ramirez time to collect himself rather than attempt to talk him through the legal requirements of the plea colloquy.

Mr. Ramirez's guilty plea was not rendered involuntary by ineffective assistance of counsel because his counsels' performance was not deficient.[28]  First, counsel's conduct was not deficient with respect to communicating the terms of the Government's plea offers nor with respect to communicating the second, "revived" offer's October 11, 2024 expiration date.  Mr. Ramirez's former counsel affirmatively communicated the terms of those offers and the relevant expiration date multiple times before the second offer expired.  Mr. Fields, Mr. Brackley, and Mr. Smith discussed the availability of the first plea offer and explained its terms to Mr. Ramirez on April 24, 2024.  Tr. at 165:25–166:5; GX 1.  But Mr. Ramirez "was not interested in that offer because he felt as though there wasn't significant enough evidence to suggest that he should accept that particular offer."  *Id.* at 165:3–9.  As is his right, Mr. Ramirez rejected that offer outright.

After the Superseding Indictment was returned, that initial offer was no longer available.  However, the Government agreed to extend the initial offer until October 11, 2024, at which point the offer would expire.  *Id.* at 166.  That conversation was memorialized by email dated October 3, 2024.  GX2 ("We have to know by next Friday, 10/11, if he would plead to this offer or there will be no offer.").  Mr. Ramirez's attorneys communicated the availability of the plea offer to him that same day, then met with Mr. Ramirez on October 8, 2024[29] to more thoroughly discuss the revived

---

[28] Mr. Ramirez asserts that Mr. Fields and Mr. Brackley's representation was deficient because they did not file any pretrial motions. Dkt. No. 781-2 ¶12; 13. Mr. Fields admitted that he did not file any pretrial motions, Tr. at 188:4, but identified various strategic reasons as to why he believed that filing any such motions would not have helped Mr. Ramirez at trial. *Id.* at 188–89. And Mr. Fields believed that he could file motions *in limine* "as the trial developed." *Id.* 191:6–25. Mr. Field was incorrect—the Court set a schedule for the filing of any pretrial motions, including motions *in limine*, and that deadline had passed. Dkt. No. 458. Regardless, Mr. Ramirez has not "explained why [filing] these motions would have changed his decision to plead guilty" and this assertion is accordingly "insufficient to warrant relief." *White v. United States*, No. 24-cv-5590, 2025 WL 2962617 at *8 (S.D.N.Y. Oct. 21, 2025).

[29] Mr. Ramirez's own testimony supports his former attorneys' rendition of events. Mr. Ramirez concedes that, on October 8, 2025, his attorneys met with him to communicate the terms of the revived plea offer. Tr. at 66:24–67:2

plea and its terms.  GX 11 (Mr. Ramirez:  "They offered me 15"); Tr. at 68:4–7.

Mr. Ramirez and Mr. Fields both testified that during that October 8, 2024 meeting, Mr. Fields "told Mr. Ramirez explicitly, if you did something, [] you should consider this offer."  *Id.* at 62:14–19 (Mr. Ramirez:  "I was told by Darren Fields to consider the plea."); 169:2–11.  Mr. Fields explained the possible punishment Mr. Ramirez could receive if he were to accept the offer and explained that the offer carried a fifteen-year mandatory minimum.  *Id.* at 169:25–170:8.  Mr. Fields also explained that the offer was only available until October 11, 2024.  *Id.* at 173:3–5.  Mr. Fields testified credibly that he never indicated that the revived offer would remain open beyond October 11, 2024 and that he never told Mr. Ramirez that he could convince the Government to reextend the offer past that date.  *Id.* at 174:4–175:22.  Mr. Brackley confirmed that they told Mr. Ramirez about the plea "numerous times" and that Mr. Ramirez knew about the expiration date which was included on the plea agreement itself.  Tr. II at 367:13–24.  Ultimately, Mr. Ramirez decided to reject the plea offer because he did not want to accept an offer with more than a ten-year mandatory minimum and because the offer would require he admit responsibility for more than just his involvement in distributing Oxycodone.  Tr. II at 368:1–5; Tr. at 169:11–24; DXI.

The Court does not credit Mr. Ramirez's assertions that his attorneys failed to communicate[30] that the second offer would expire on October 11, 2025 because those assertions are contradicted by Mr. Ramirez's own testimony and by Mr. Fields's and Mr. Brackley's credible testimony.  Dkt. No. 781-2 ¶ 22.  Mr. Ramirez saw the October 3, 2025 email where the Government made clear that the offer would expire on October 11, 2025.  Tr. at 35:6–11 (Mr. Ramirez:  [A]nd the second time, they said that it had something of a slight guidelines change or

---

[30] Mr. Ramirez asserts that even though his attorneys did communicate that the offer "was going to expire" they also indicated that the offer "will remain and [he] will be able to still get the offer if [he] was pleading guilty before trial."  *Id.* at 68:16–18.  The Court cannot credit this assertion, which is contradicted both by Mr. Fields's and Mr. Brackley's testimony and also by the explicit language of the Government's October 3, 2024 email memorializing the terms of the offer, which Mr. Ramirez reviewed shortly after that email was sent to his counsel.  Tr. at 43:4–9.

something like that, which I read in an email that the lawyers showed me.").  As Mr. Ramirez

explained:

> So, at the beginning of October when they communicated the plea offer, they
> showed me an email that came from the government to them that it said that the
> offer, I mean, that the offer was 15 mandatory minimum and it also said that there
> was an expiration date for October.  So this was October 8,[31] they said the expiration
> date was October 11.

*Id.* 43:4–9.

And Mr. Ramirez admits that his attorneys "told [him] that offer was going to expire."[32]  *Id.*

at 70:4–6.  Mr. Fields testified credibly that "he made it clear [to Mr. Ramirez] that he had a

deadline," Tr. II at 358:17–20, because the offer was only available until October 11, 2024, that he

never indicated that the revived offer would remain open beyond the October 11, 2024 expiration

date, and that he never told Mr. Ramirez that he could convince the Government to reextend the

offer past that expiration date.  Tr. at 173:3–5, 174:4–175:22.  Mr. Brackley's testimony supports Mr.

Fields's rendition of events.  Tr. II at 367:13–24.

And as for the *Pimentel* letter dated November 1, 2024, Mr. Ramirez admitted that his

attorneys advised him of that letter nearly as soon as they received it— on the morning of

November 1, 2024.  *Id.* at 196:3–5; GX3.  Because Mr. Ramirez's attorneys only received that letter

themselves the night before, they could not have spoken with him to discuss the letter any earlier.[33]

Because Mr. Ramirez's counsel communicated the *Pimentel* letter and its terms to Mr. Ramirez as

---

[31] Mr. Ramirez's testimony appears to suggest that he did not receive any communication from his attorneys with respect to the revived plea, nor did he review the email memorializing that plea, until the in-person meeting on October 8, 2025. The Court does not credit this testimony because on October 3, 2024—the same day that Mr. Brackley and Mr. Fields received the revived plea offer via email—Mr. Ramirez texted a friend that "they offered me 15."  GX11.

[32] During that meeting, Mr. Fields "explicitly advised" Mr. Ramirez that he should consider the offer and communicated that the offer would expire. Tr. at 169:5–6. Mr. Ramirez declined to accept the offer because, as he has consistently explained, he did not want to admit guilt for "other drugs" that he asserted he was not responsible for. *Id.* at 169:22–24.

[33] The speed of events here is partially attributable to Mr. Ramirez's own decisions.  Mr. Ramirez advised his attorneys he wanted to plead guilty on October 31, 2024. Tr 193:14. A change of plea hearing was scheduled for the following day, after Mr. Ramirez's attorneys coordinate amongst themselves and with Government counsel. Tr 194:6–9. The Government sent Mr. Ramirez's attorneys the *Pimentel* letter, which was dated November 1, 2024, GX3, on the evening of October 31, 2024. Tr 196:3–4.

soon as they were practically able to do so, counsel's performance was not deficient with respect to advising Mr. Ramirez of that letter.

And counsel's performance was not deficient because—although Mr. Ramirez was only able to review the *Pimentel* letter the morning of his change of plea hearing—Mr. Ramirez's counsel had discussed the Superseding Indictment with him at length earlier, as Mr. Ramirez admitted.  Tr. at 110:9–14, 112–113.  Because Mr. Ramirez had reviewed the Superseding Indictment, he knew what the guidelines range in the *Pimentel* letter was and knew what charges he would have to plead guilty to.  Given the timing of his decision to plead guilty, Mr. Ramirez did not have a substantial amount of time to review the *Pimentel* letter itself, but the *Pimentel* letter mirrors the Superseding Indictment. Because Mr. Ramirez had read the Superseding Indictment and the prior plea offers, he was not learning for the first time what it meant to plead guilty to the Indictment itself nor was this the first time he learned of his possible sentencing exposure.

Second, Mr. Fields's conduct did not fall below an objective standard of reasonableness because Mr. Fields decided, based upon his years of experience as a criminal defense attorney generally and his experience working for Mr. Ramirez specifically, not to have a lengthier conversation with Mr. Ramirez during the second, extended recess at Mr. Ramirez's change of plea hearing.  Mr. Fields has worked as a criminal defense attorney for over twenty-five years and has represented hundreds of criminal clients, with a particular focus on representing individuals going to trial.  Tr. at 153:19, 153:22–23, 154:3–6.  And by the date of the change of plea hearing, Mr. Fields had been representing Mr. Ramirez for over a year.

Although the Court instructed Mr. Fields to use the recess to "confer with [his] client," Plea Hearing Tr. at 7:16–8:25, Mr. Fields decided to speak to Mr. Ramirez only briefly when back in the courtroom, because, based on his experience, Mr. Fields determined that he did not want to "browbeat Mr. Ramirez into anything one way or the other" and that "this was [Mr. Ramirez's] time

39

to step up and stand up." Tr. at 50:21; 204:24–205:6. At the outset, the Court notes that Mr. Fields interpreted the Court's comment correctly—the Court's instruction to "confer" with Mr. Ramirez was not an order directing Mr. Fields to have any particular conversation with his client. Rather, the Court's comment was an instruction that Mr. Fields use his professional judgment to counsel his client in a manner that would best serve Mr. Ramirez.

Mr. Fields's decision to give Mr. Ramirez some space to come to a decision about whether he, in fact, wanted to plead guilty that day fell well "within the wide range of reasonable professional assistance." *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015) (internal citation and quotation omitted). As Mr. Fields explained, "what [he] wasn't going to do, [he] wasn't going to go downstairs, right, and then have [] [Mr. Ramirez] tell the court later on that [his attorney] forced him into taking a plea. . . . So in [Mr. Fields's] professional judgment, [he] said [Mr. Ramirez] either had to accept his plea or not." Tr. II at 360:10–18.

Mr. Fields reasonably determined that Mr. Ramirez did not lack knowledge of the law or the consequences of his plea—for those issues had been adequately discussed. What Mr. Ramirez needed, Mr. Fields reasonably concluded, was time to contemplate his decision. Mr. Fields's perspective on the situation was apt—Mr. Ramirez confirmed that he used this time to pray and reflect. *Id.* at 106:15–17. And, following this opportunity for introspection, Mr. Ramirez returned to Court much calmer. *Id.* at 206:1–21. The Court observed Mr. Ramirez's change in behavior; Mr. Ramirez was, at this point, able to answer the Court's questions and pleaded guilty. Accordingly, Mr. Fields's decision to allow Mr. Ramirez time to collect himself and think over his options was not deficient.

In sum, Mr. Ramirez's former counsel affirmatively and timely communicated all plea offers to him, communicated that the "revived" offer would expire before it did in fact expire, explained the terms and consequences of the offers, and afforded Mr. Ramirez the time he needed to

40

contemplate what it would mean to plead guilty to the Superseding Indictment.  Because Mr. Ramirez has failed to show that his former counsels' conduct was deficient, Mr. Ramirez has not met his burden under the first prong of the *Strickland* framework.  And because "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim," "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."[34]  *Strickland*, 466 U.S. at 697, 700.  Accordingly, Mr. Ramirez's failure to demonstrate that his counsel's performance was deficient is dispositive of his claim that ineffective assistance rendered his guilty plea involuntary.[35]

## VI.    CONCLUSION

For the forgoing reasons, Mr. Ramirez's motion to withdraw his guilty plea is DENIED.

---

[34] Mr. Ramirez does not assert that his counsel were ineffective because they failed to adequately review discovery materials with him.  *See generally* Mem.  Mr. Ramirez did however identify this asserted deficiency at several points throughout his testimony, so the Court will address it briefly.  Tr. at 32:4–5.  Any claim that Mr. Ramirez's plea was rendered involuntary by his attorneys' failure to share discovery materials with him fails under the second prong of *Strickland* because Mr. Ramirez cannot show prejudice.  Mr. Ramirez cannot show prejudice because he testimony reflects that any alleged failure of his former counsel to review discovery materials had no impact on Mr. Ramirez's decision to plead guilty.  Rather, as Mr. Ramirez admitted, his counsels' alleged failure to share those materials—"so, to plead guilty, they didn't really affect [him] so much."  Tr. at 33:19–20.

[35] The Court writes to acknowledge one issue that arose during the evidentiary hearing—the specter of Mr. Smith, "who is the boogeyman" here.  Tr. III at 465:21.  At the evidentiary hearing, Mr. Ramirez raised concerns that Mr. Smith's conflicting advice, which often directly contradicted Mr. Brackley's and Mr. Fields's advice, rendered his plea involuntary by reason of confusion.  And Mr. Ramirez asserted that Mr. Brackley and Mr. Fields were ineffective because they failed to supervise Mr. Smith.  The Court acknowledges that an attorney's failure to supervise a paralegal who is giving a defendant incorrect legal advice may give rise to a viable claim for ineffective assistance of counsel.  But this is not at issue on the factual record here because Mr. Ramirez himself hired Mr. Smith with full knowledge that Mr. Smith was a paralegal and not an attorney.  GX7.  Mr. Smith worked directly for Mr. Ramirez.  There is no evidence that either lawyer retained Mr. Smith.  Tr. II at 233:21–23 (Mr. Fields: "What I'm telling you is whatever arrangement Mr. Ramirez had with Ivan Smith, that's the arrangement he had with Ivan Smith.").  Mr. Fields testified credibly that Mr. Smith "is not on [his] payroll."  *Id.* at 349:3–4.  And Mr. Fields was paid by Mr. Smith, not vice versa.  *Id.* at 229:10–12 (Mr. Fields: "[How I was paid, [] Ivan Smith brought me the money.").  Because Mr. Smith was hired and employed directly by Mr. Ramirez himself, neither Mr. Brackley nor Mr. Fields had a duty to supervise Mr. Smith.  And any confusion that Mr. Ramirez experienced because of his decision to seek the advice of a lay person in addition to advice of his counsel is not the result of ineffective assistance of counsel: Mr. Ramirez's attorneys worked to disabuse Mr. Ramirez of any ill-informed advice offered by Mr. Smith.  Tr. III at 443:12–444:10 (Mr. Brackley: "I don't hold Smith at fault for that.  Maybe Ramirez needed to hear it.  Maybe he needed to go through that.  He was being asked to give up 15 years of his life.  And maybe he needed to hear that there was a defense that nobody thought about.  There was a way to look at the facts that nobody thought about.  And he's entitled to that.  Smith provided that opportunity to him, it seemed to me, but Mr. Fields and I were correcting it as time went along.").

41

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 781.

    SO ORDERED.

    Dated:  December 8, 2025
    New York, New York

                                   GREGORY H. WOODS
                             United States District Judge